UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TONI EYLSE MCNARY, | ) |
| Plaintiff, | ) |
| vs. | ) Cause No. 1:14-cv-1807-WTL-TAB |
| AARON HAMER, | ) |
| Defendant. | ) |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL

A bench trial was held in this case on December 20, 2017. The Court, having considered the evidence submitted at trial, hereby makes the following findings of fact and conclusions of law.[1]

### I. FINDINGS OF FACT

On June 18, 2014, Plaintiff Toni McNary voluntarily sat down for an interview with Indianapolis Metro Police Department ("IMPD") Detective Cheryl Cameron at a police station in Indianapolis. McNary came to the station with her mother, Kay Deamus, and McNary's young nephew. The subject of the interview was an incident in which McNary was involved that occurred on April 10, 2014 (hereinafter referred to as the "April Incident"). The interview came about because McNary's car had been impounded following the April Incident and McNary had called Cameron repeatedly about having her car released from impoundment. McNary thought that the interview with Cameron would give her the opportunity to give her version of what took place during the April Incident.

---

[1] Any finding of fact more appropriately considered a conclusion of law should be so deemed and vice versa.

Cameron's lengthy interview was video and audio recorded in its entirety. The recording reveals that Cameron was professional in her tone and demeanor throughout the interview, and McNary likewise was polite and level-headed and used a normal conversational tone throughout the interview.

After the interview had gone on for approximately two hours, Cameron left the interview room to go across the hall to speak to a prosecutor. McNary also left the interview room to use the restroom. After McNary returned to the room, she spoke with her attorney on her cellphone; he advised her to leave the interview. Cameron then returned to the room[2] and told McNary that

---

[2]McNary testified that she told Cameron at this point that her attorney had called and advised her to leave; the videotape does not support that testimony. Nor does the videotape support McNary's testimony that McNary asked Cameron if she needed a lawyer, that Cameron told McNary that she did not need to have an attorney present, and that Cameron did not read McNary her *Miranda* rights until thirty minutes into the interview. *See also* Dkt. No. 98 at 13 (Plaintiff's Proposed Finding that "while Detective Cameron is not a Defendant, she willfully misled Toni McNary to believe that she was not about to be arrested, had no risk of being arrested, and persuaded her not to call an attorney or to rely upon an attorney when that was her absolute right"). The interview began just before 2:15 p.m. Cameron checked McNary's identification and the two discussed McNary's living situation, the names of McNary's family members, and the ages of her children. Cameron then stated that the purpose of the interview was to allow McNary to give her side of the story with regard to the April Incident and that, "just like on TV," she was going to advise McNary of her rights. Cameron then began to read an advice of rights form to McNary just before 2:19 p.m. The form advised her, inter alia, that she had a right to remain silent and the right to talk to a lawyer before answering any questions, and concluded with "you also have the right to stop answering at any time until you talk to a lawyer." Cameron then asked McNary if she had an attorney; when she said that she did, Cameron asked her if she had talked to him about "this." McNary told Cameron that she had and that the attorney had been "helping her a lot because this is not the only incident." She then began telling Cameron about an incident that occurred in March that her attorney was helping her with. At 2:22 p.m. Cameron interrupted McNary's story and asked her to sign the advice of rights form before they continued the interview. McNary did so. At no time did McNary ask if she should have her lawyer present, and at no time did Cameron suggest that it was not necessary for McNary to consult with her lawyer.

The Court includes these facts not because they are relevant—they are not, as Cameron is not a Defendant in this case and her actions before Hamer became involved in the situation cannot form the basis of liability on the part of Hamer—but rather as an example of the inconsistencies between McNary's testimony and proposed findings of fact and the videotape,

she had spoken to the prosecutor and that McNary was going to be placed under arrest for charges relating to the April Incident.

The fact that she was going to be arrested came as a complete surprise to McNary. She began arguing with Cameron in a calm manner, stating her belief that she had not done anything wrong, explaining that a family member who had been involved in the April Incident was the one who should be arrested, and asking to call her lawyer. She emphasized that she would not have voluntarily come in to be interviewed if she thought it would lead to her arrest. Cameron told her that she could call her lawyer from the jail, but that at that time she needed to put her hands behind her back to be handcuffed. At that point, both McNary and Cameron were standing in the interview room. Cameron calmly took hold of McNary's right wrist in order to handcuff her, but McNary pulled her arm away and began screaming and flailing her arms, trying to prevent Cameron from attaching the handcuffs to her. McNary backed into the wall[3] and continued to scream that she was not going to jail.

At that point, Cameron asked Hamer to assist her. Cameron had earlier informed Hamer that she was interviewing McNary and that she "could be a potential problem when arresting her." Hamer had been in the prosecutor's office across the hall from the interview room and had entered the interview room to assist Cameron when he heard screaming. When Hamer entered the interview room, he saw McNary flailing her arms toward Cameron as Cameron tried to handcuff her. Hamer testified that McNary was "hysterical" and Cameron was telling McNary

---

which is uncontroverted evidence of record. *See* Dkt. No. 98 at 3 ("The interview was video and audio recorded and the recording ran continuously without interruption.").
    [3]The Court finds that Cameron did not "slam" McNary into the wall or push her forcefully into the wall as suggested by the Plaintiff's counsel at trial. The video clearly shows otherwise.

to put her hands behind her back. The Court finds that testimony to be consistent with the videotape of the incident.[4]

Hamer, who is much larger than McNary and Cameron, assisted Cameron in moving McNary out from the wall so that she could be handcuffed. McNary continued screaming that she would not be going to jail. After the two detectives struggled with McNary for a few seconds, Cameron was able to cuff McNary's right wrist. When she continued to struggle, Hamer attempted to take her down to the ground using a leg sweep, but was unsuccessful. Cameron then successfully used a leg sweep to bring McNary down to the ground. Both detectives went down to the ground with her, and Hamer was able to handcuff McNary's left hand. In the course of taking McNary to the ground, Hamer heard a pop, and McNary began to scream that her arm was broken.[5] A uniformed officer who had come to the room used his radio

---

[4] McNary testified that at some point after she began yelling she asked to be handcuffed with her hands in front rather than behind her back because of an injury she had suffered that made it painful to have her hands behind her back. The Court is unable to hear such a statement on the video, but once the screaming begins it is sometimes difficult to determine exactly what McNary is saying. The Court notes, however, that McNary's proposed finding of fact that "Ms. McNary repeatedly explains she had a recent back injury and cannot put her wrists together behind her back," Dkt. No. 98 at 5, is simply not true. Nor is it true that "Ms. McNary's only act of resistance is that she is trying to keep her hands from being put behind her back." *Id.* McNary can be understood on the tape to be screaming repeatedly that she was not going to go to jail. Some of what she screams is not discernible, and it is possible that it included something about not wanting to be handcuffed behind her back due to an injury, but the screaming cannot reasonably be characterized as "explaining" anything. When McNary was asked at trial why she did not cooperate with Cameron, she stated that she "wasn't expecting to go to jail" and that she felt like she had been the victim in the April Incident and should not be the one arrested in conjunction with that incident. She also testified that she was flailing because she "didn't want them to touch me." Thus, her own testimony is contrary to the assertion that her "only act of resistance is that she is trying to keep her hands from being put behind her back." She was trying to avoid being arrested because she did not believe the charges against her were fair.

[5] McNary testified that Hamer "karate chopped" her left arm and broke it before she fell to the ground. The Court does not credit this testimony. While McNary testified that the karate chop occurred out of view of the camera, McNary's recollection of the events is directly contradicted by the videotape in many other respects, making her recollection of this detail suspect as well. The Court instead credits Hamer's testimony that he did not karate chop

4

to summon emergency medical help almost immediately; medics arrived about eight minutes later. In the meantime, McNary remained handcuffed on the floor. An x-ray later revealed that McNary had suffered a nondisplaced fracture of her left humerus.

## II. **CONCLUSIONS OF LAW**

The issue before the Court is whether Hamer used excessive force in assisting in the arrest of McNary. McNary has the burden of providing her claims by a preponderance of the evidence.

McNary alleged in her Complaint and testified at trial that Hamer purposely broke her arm. The Court finds that he did not; rather, McNary's arm was accidentally broken when Hamer and Cameron took McNary to the ground in order to handcuff her. The question is whether the actions taken by Hamer were objectively reasonable.

> A claim that a law enforcement officer used excessive force when effectuating an arrest is analyzed under the Fourth Amendment's objective reasonableness standard. Whether a police officer used excessive force is analyzed from the perspective of a reasonable officer under the circumstances, rather than examining the officer's actions in hindsight. The reasonableness of an officer's actions must be determined by examining the specific circumstances of the arrest, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Avina v. Bohlen*, 882 F.3d 674, 678 (7th Cir. 2018) (internal citations and quotation marks omitted). In this case there is no question that McNary was actively resisting arrest. The Court also finds that given McNary's hysterical reaction, she did, in fact, pose a threat to the officers. While it is not likely that she would have caused the officers severe injury, the possibility

---

McNary's arm and that the injury occurred in the course of the fall to the ground. This also is more consistent with the part of the struggle that can be viewed on the videotape. Given what can be seen on the video, it is difficult to imagine a scenario in which Hamer would have been in a position to karate chop McNary's left arm.

certainly existed; for example, she could have picked up one of the chairs in the room and used it as a weapon.⁶ In light of the totality of the circumstances, Hamer's actions, including working with Cameron to take McNary to the ground in order to gain control over her and handcuff her, were reasonable. It is unfortunate that the result of those actions was that McNary's arm was broken, and the Court is in no way suggesting that McNary deserved to have her arm broken because of her own actions. But the fact that McNary suffered an injury does not, by itself, render the actions taken by Hamer in the face of McNary's resistance unreasonable.

In addition to arguing that Hamer used excessive force to handcuff her, McNary also states in her proposed findings that she "was subjected to excessive force and lack of medical care by Aaron Hamer who failed to remove the handcuffs after [McNary] vehemently complained that she had a broken arm and was in extreme pain." Dkt. No. 98 at 10. "The Fourth Amendment's objective reasonableness standard applies here, too." *Horton v. Pobjecky*, 883 F.3d 941, 953 (7th Cir. 2018) (citing *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 503 (7th Cir. 2010)). Thus, McNary must prove by a preponderance of the evidence that Hamer's response to McNary's medical needs was objectively unreasonable, and that Hamer's response caused harm. *Id.* (citing *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011)).

> *Ortiz* provides four factors to determine whether an officer's actions regarding medical care were objectively unreasonable: (1) whether the officer had notice of the medical needs; (2) the seriousness of the medical needs; (3) the scope of the requested treatment; and (4) police interests that might inhibit providing treatment. *Ortiz*, 656 F.3d at 530. "[T]he Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the

---

⁶The Court finds that the severity of the crimes for which the Plaintiff was being arrested is of minimal relevance in this case, inasmuch as the crimes had occurred months earlier. *Cf. Becker v. Elfreich*, 821 F.3d 920, 927 (7th Cir. 2016) ("In this case, Becker's underlying crime was a serious felony—he was charged with holding a knife to his brother-in-law's throat. But that alleged crime took place several weeks earlier and there was no evidence that Becker was still armed at the time officers executed the arrest warrant.").

third factor—the scope of the requested treatment." *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007).

*Horton*, 883 F.3d at 954. In this case, there is no evidence that there was anything that Hamer reasonably could have done to decrease McNary's level of pain before the medics arrived. In fact, McNary's own testimony suggests otherwise, as she testified that her pain was not relieved by the removal of the handcuffs. In addition, the video reveals that once the medics arrived and began the process of moving her, any movement of her arm was very painful. Therefore, McNary has failed to prove that it was unreasonable for Hamer to wait for trained medical professionals—who were called almost immediately and arrived in a matter of minutes—to provide medical care for her.

### III. CONCLUSION

For the reasons set forth above, the Court finds that McNary has not proven her claims of excessive force and failure to provide medical care against Hamer. Accordingly, judgment will be entered in favor of Hamer on all of McNary's claims.

SO ORDERED: 3/23/18

*[signature]*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification